ROBERT WENZ AND JUDITH WENZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wenz v. Commissioner
Docket No. 28427-91
United States Tax Court
T.C. Memo 1995-277; 1995 Tax Ct. Memo LEXIS 278; 69 T.C.M. (CCH) 2961; June 21, 1995, Filed *278 Decision will be entered under Rule 155. For petitioners: Lawrence C. Rubin and Daniel G. Pappano. For respondent: Scott M. Estill and Jonathan P. Decator. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: On October 2, 1991, respondent mailed to petitioners a timely notice of deficiency in which respondent determined deficiencies in petitioners' joint Federal income tax for 1986, 1987, and 1988 and additions to tax as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(b)(1)
6653(b)(1)(A)
6653(b)(1)(B)
6661
1986
$ 78,306
$ --  $ 58,780 * $ 19,577
1987
73,789
--  55,342 * 18,447
1988
317,678
238,259
--  --
79,420
* 50 percent of interest due on the portion of the
underpayment attributable to fraud.
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After settlement, the issues for decision are: (1) Whether petitioners are to be treated as having received constructive dividend income from two of petitioners' wholly owned corporations and, if so, *279 the amount of such constructive dividend income; (2) alternatively, whether these two corporations are to be treated as sham corporations that are to be disregarded for Federal income tax purposes, in which case petitioners would be charged with income nominally realized by these corporations and, if so, the amount of such income; (3) whether a family trust in which petitioners were grantors (The Wenz Family Trust) is to be treated as a grantor trust or as an economic sham, in either of which cases petitioners would be charged with income nominally earned by the trust; (4) the amount of capital gain income petitioners realized in 1987 from sale of real property located in Hawaii; (5) whether petitioners in 1986 received additional interest income; (6) whether petitioners are liable for fraud or, in the alternative, negligence additions to tax; and (7) whether petitioners are liable under section 6661 for substantial understatement additions to tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. During 1986 through 1988, petitioners resided part time in Santa Barbara, California, and part time in London, England. At the time the petition was filed, petitioners *280 resided in London, England. Petitioner Robert Wenz (Robert) received a B.S. in finance and economics and an M.B.A. degree. Petitioner Judith Wenz (Judith) received a B.A. in education. From 1962 through 1969, Robert was employed as a management consultant for Arthur Andersen & Co., Public Accountants, and from 1970 through 1986, Robert was employed as an investment banker and as a financial consultant. Prior to 1986, Judith was employed as a school teacher. During 1986, 1987, and 1988, petitioners wholly owned or controlled at least seven different corporations or other entities. Petitioners were both officers and directors of some of the corporations, and petitioners engaged in various transactions by which their funds were moved from one corporation or entity they controlled to another without any apparent business purpose. Many of these transactions were initiated by petitioners for their personal benefit. With regard to these corporations and entities that petitioners owned or controlled and with regard to many of the transactions by which petitioners transferred funds among these corporations and entities for petitioners' personal benefit, the chart below sets forth some *281 of the relevant background facts, indicates the degree of petitioners' ownership interest in each corporation or entity (to the extent reflected in the record), and highlights the manner by which the various controlled corporations and entities were used by petitioners for their personal benefit. The chart also indicates whether U.S. Federal income tax returns were filed on behalf of these controlled corporations and entities. Entity
Formed
Domiciled OMR Corp.
March 3, 1978
Illinois
HSR Corp.
April 30, 1976
Illinois
The Wenz
March 7, 1977
California
Family
Trust
E.E.I. Corp.
Sept. 20, 1974
Illinois
Western
Nov. 24, 1977
Cayman
Investment
Islands
Corp.-Cayman
Islands
Western
Not in record
Hawaii
Investment
Corp.-Hawaii
Binney
Dec. 19, 1980
Illinois
Properties,
Ltd.
Relationship To Entity
Petitioners Ownership
OMR Corp.
Pres.-Judith
Judith-100%
Sec. & Treas.-Robert
HSR Corp.
Pres.-Judith
Judith-100%
Sec. & Treas.-Robert
The Wenz
Grantors-Judith & Robert
Grantors-Judith & Robert
Family
Trust
Trustee-Judith
Beneficiaries-Judith &
Robert's 2 children
Beneficiaries-Judith &
Robert's 2 children
E.E.I. Corp.
Pres.-Judith
Judith-100%
Sec. & Treas.-Robert
Western
Not in record
Wenz Trust-100%
Investment
Corp.-Cayman
Islands
Western
Pres.-Robert
Judith & Robert
Investment
Sec.-Judith
apparently had
Corp.-Hawaii
some ownership
interest
Binney
Pres. & Treas.-Robert
Wenz Trust-100%
Properties
Sec.-Judith
Ltd.
*282 Judith and/or Robert Bank Accounts
Authorized Entity
With
to Sign on the Accts.
OMR Corp.
Barclays Bank of California,
Yes
Santa Barbara, CA
HSR Corp.
Barclays Bank of California,
Yes
Santa Barbara, CA
Lloyds Bank of London,
Not in record
London, England
The Wenz
Not in record
Not in record
Family
Trust
E.E.I. Corp.
Barclays Bank of California,
Yes
Santa Barbara, CA
Wells Fargo Bank,
Yes
Santa Barbara, CA
Western
Not in record
Not in record
Investment
Corp.-Cayman
Islands
Western
Barclays Bank of California,
Yes
Investment
Santa Barbara, CA
Corp.-Hawaii
Wells Fargo Bank,
Yes
Santa Barbara, CA
Binney
Not in record
Not in record
Properties,
Ltd.
Transactions Benefiting 1986-1988 Entity
Petitioners Tax Returns OMR Corp.
(1) Payment of Judith's &
Returns untimely
Robert's personal expenses;
filed on
(2) Transfers of personal funds by
July 16, 1990
Judith & Robert into OMR's account;
(3) Transfers of funds to and from
entities controlled by Judith & Robert.
HSR Corp.
(1) Payment of Judith's &
Returns untimely
Robert's personal expenses;
filed on
(2) Transfers of funds to and from
July 16, 1990
entities controlled by Judith & Robert;
(3) Property of HSR used as collateral
for Robert's $ 500,000 personal
line of credit.
The Wenz
(1) Trust assets used by Robert to
None filed
Family
obtain $ 500,000 personal line of credit;
Trust
(2) Transfers of funds to trust from
entities controlled by Judith & Robert.
E.E.I. Corp.
(1) Payment of Judith's &
None filed
Robert's personal expenses;
(2) Payment provided for Judith's
individual purchase of real property
located in Hawaii;
(3) Transfers of funds to and from
entities controlled by Judith & Robert.
Western
(1) Corporate brokerage account used by
None filed
Investment
Robert to obtain $ 500,000 personal
Corp.-Cayman
line of credit.
Islands
Western
(1) Payment of Judith's &
None filed
Investment
Robert's personal expenses.
Corp.-Hawaii
Binney
(1) Funds from sale of property of OMR
None filed
Properties,
transferred to Binney Properties.
Ltd.
*283 During 1986, 1987, and 1988, the same post office box mailing address in Santa Barbara, California, was used for four of the above corporations and entities that were owned or controlled by petitioners (namely, OMR Corp. (OMR), HSR Corp. (HSR), E.E.I. Corp. (E.E.I.), and Western Investment Corp. of Hawaii (Western Investment-Hawaii)). This post office box was rented by petitioners. Also, during 1986, 1987, and 1988, the above post office box mailing address in Santa Barbara, California, was used by two other corporations (namely, Bishops Bank and Trust Co., Ltd. (Bishops Bank) and Kingston Finance and Mortgage Co. (Kingston Finance)), which two corporations were also used repeatedly by petitioners to transfer petitioners' funds among the corporations and entities owned or controlled by petitioners. Although it appears that petitioners had a significant ownership interest in and control over Bishops Bank and Kingston Finance, the exact nature and degree of petitioners' ownership interest in and control over these two entities are not reflected in the record. OMR
On March 16, 1978, Judith purchased from Robert and from an apparently unrelated party residential real property *284 located at 265 Olive Mill Road, El Montecito, California, for a total purchase price of $ 60,000. On October 30, 1981, Judith purportedly transferred to OMR her ownership interest in this property (the OMR Property), for a nominal consideration of less than $ 100. On September 2, 1986, the OMR Property was sold to Lee Waisler (Waisler) for a total price of $ 260,000. On October 8, 1986, Waisler paid to an escrow agent the $ 160,000 cash downpayment due on his purchase of the OMR Property, and Waisler executed in favor of OMR a promissory note reflecting the balance due of $ 100,000. Under the terms of Waisler's promissory note, Waisler was to pay OMR $ 878 a month for 24 months, plus 10-percent annual interest. On October 31, 1986, $ 150,222 representing the net cash proceeds received from Waisler on sale of the OMR Property was deposited by the escrow agent into OMR's checking account at Barclays Bank of California, Santa Barbara, California (Barclays Bank of California). Thereafter, on the dates indicated below, the following checks were written by Robert. Each check appears to relate to the cash proceeds received on sale of the OMR Property: Date
Amount Drawn on Account of
In Favor of
October 31, 1986
$ 100,000
OMR
Binney Properties
November 3, 1986
50,000
OMR
Bishops Bank
November 3, 1986
53,000
Bishops Bank
Kingston Finance
November 3, 1986
51,000
Kingston Finance
Bank of America
*285 The record does not establish whether the $ 100,000 check dated October 31, 1986, was deposited into a bank account owned by Binney Properties, nor does the record otherwise establish who actually received this $ 100,000. As indicated, however, in the chart supra p. 5, Binney Properties was owned by The Wenz Family Trust which was controlled by petitioners. The above checks dated November 3, 1986, were each deposited into bank accounts of the indicated payees, which accounts the payees maintained at banks located in Santa Barbara, California. The last of the above checks dated November 3, 1986 (namely, the $ 51,000 check in favor of Bank of America N.T. & S.A., Santa Barbara, California (Bank of America)), was used to make a payment by petitioners on a personal loan petitioners owed to Bank of America. Based on the above series of essentially simultaneous checks that were written by Robert, it appears that the entire $ 150,222 net cash proceeds realized on sale of the OMR Property accrued to the personal benefit of petitioners (the first $ 100,000 by transfer thereof to Binney Properties, which was owned by The Wenz Family Trust, and the approximate $ 50,000 balance of the *286 net cash proceeds by payment thereof on petitioners' personal loan owed to Bank of America). Aside from activities in early 1986 relating to nominal legal title to the OMR Property, the record does not establish that OMR engaged in any business activity, that it had a business office, or that it had a payroll, nor does the record establish that OMR had any regular corporate records of business activities. Apparently, OMR existed only to hold nominal legal title to the OMR Property. During 1986, 1987, and 1988, OMR filed Domestic Corporation Annual Reports with the State of Illinois. Corporate Federal income tax returns for OMR's taxable years ending September 30, 1986, 1987, 1988, and 1989, were not timely filed. As a result of respondent's audit, Robert prepared, or had prepared, OMR's corporate Federal income tax returns for all of the above years, and these returns were untimely filed on July 16, 1990. On OMR's untimely filed corporate Federal income tax return for its taxable year ending September 30, 1987, OMR's adjusted tax basis in the OMR Property that was sold in 1986 for $ 260,000 was reported to be $ 259,778, and after expenses associated with the sale, there was *287 reported on OMR's tax return a net gain from sale of the OMR Property of only $ 222. Petitioners, on their 1986 joint Federal income tax return, did not report any income from sale of the OMR Property. On audit for 1986, respondent determined that petitioners received a $ 150,000 constructive dividend from OMR relating to sale of the OMR Property. Respondent based her computation of the $ 150,000 constructive dividend on the $ 150,222 net cash proceeds received by OMR on sale of the OMR Property, rounded to $ 150,000. Alternatively, respondent argues that OMR was a sham corporation and, therefore, that $ 150,000 of the capital gain that respondent determined was realized on sale of the OMR Property should be taxed directly to petitioners. HSR
On April 30, 1976, Judith purchased real property located at 288 Hot Springs Road, El Montecito, California, for total consideration of $ 265,000. In connection with her purchase of this property, Judith executed in favor of Great Western Savings and Loan Association a promissory note for $ 200,000. This property was purchased by Judith as a personal residence for petitioners. In addition to a large residence, there was located *288 on this property a separate small cottage. On November 3, 1981, Judith transferred legal title to this property to HSR (the HSR Property) for a nominal consideration of less than $ 100. During 1986, 1987, and 1988, HSR received rent from David and Sheila Kamens in connection with the Kamenses' rental of the small cottage located on the HSR Property. The Kamenses were authorized by petitioners to, and they did, write many checks on HSR's checking account relating to maintenance of the HSR Property. Many checks written by the Kamenses on HSR's checking account represented payment of petitioners' personal expenses relating to the HSR Property. During 1986, 1987, and 1988, the large residence located on the HSR Property was periodically rented to third parties for monthly rental payments of between $ 4,000 and $ 5,000. During 1986 and 1987, Judith, Robert, and Kingston Finance made occasional periodic payments to HSR of approximately $ 5,000, purportedly as rental payments relating to some of the months during which petitioners resided in the large residence located on the HSR Property. On July 7, 1987, HSR deeded back to petitioners the HSR Property for no consideration. Also *289 on July 7, 1987, petitioners refinanced the outstanding mortgage loans on the HSR Property by obtaining a $ 500,000 loan from Bank of America. The $ 500,000 in loan proceeds was used to pay off two previous mortgage loans on the property in the total cumulative amount of $ 352,078, and on July 8, 1987, after paying off the two mortgage loans, petitioners deposited the $ 147,922 balance of the loan proceeds into HSR's checking account at Barclays Bank of California. After the above $ 147,922 was deposited into HSR's checking account, the following checks were written by Robert: Date Amount Drawn on Account of
In Favor of
July 9, 1987
$ 145,000
HSR
Bishops Bank
July 21, 1987
100,000
Bishops Bank
Wenz Family Trust
August 10, 1987
170,000
Bishops Bank
E.E.I.
August 10, 1987
156,931
E.E.I.
Wenz Family Trust
August 19, 1987
145,000
Bishops Bank
HSR
August 19, 1987
145,000
HSR
Kingston Finance
With exception of the above $ 100,000 check dated July 21, 1987, and the $ 156,931 check dated August 10, 1987, both made payable to The Wenz Family Trust, each of the above checks was apparently deposited into checking accounts of the respective payees. The record does not *290 reflect where or how the two checks payable to The Wenz Family Trust were deposited or cashed, because, as explained more fully below, The Wenz Family Trust does not appear to have maintained a bank account. Based on the above series of checks, particularly the checks made payable to The Wenz Family Trust, it appears and we so find that petitioners, after the prior mortgage loans were paid off, received the benefit and use of the $ 147,922 net loan proceeds that were available from the above loan. On July 10, 1987, petitioners deeded back to HSR legal title to the HSR Property for no consideration. On October 21, 1988, the HSR Property was sold to George and Lizbeth Zwerdling for $ 1,550,000 in cash. Using the gross proceeds, petitioners paid the $ 498,407 balance due on the $ 500,000 mortgage loan that had been obtained in 1987 from Bank of America, the $ 458,708 balance due on a $ 500,000 personal loan of Robert's that he owed to the California Commerce Bank in Santa Barbara, California (CCB), which loan also had been secured by the HSR Property, and expenses of $ 95,099 relating to sale of the HSR property. On October 21, 1988, Robert received from the escrow agent a check *291 for $ 497,786 made payable to HSR, representing the net proceeds from sale of the HSR Property. This $ 497,786 check was apparently deposited into HSR's bank account at Lloyds Bank of London, and on December 30, 1988, there was a total balance in HSR's bank account at Lloyds Bank of London of $ 497,707.03. During 1986, 1987, and 1988, many, if not all, of petitioners' personal expenses associated with the HSR Property were paid by checks drawn on HSR's checking account, including mortgage payments, gardening fees, telephone bills, garbage collection fees, power and gas bills, water bills, and property taxes. Also, petitioners used HSR's checking account to pay personal expenses such as a $ 10,000 payment on Robert's personal loan owed to Bank of America, dog grooming and veterinarian bills, dental bills, stereo equipment, Department of Motor Vehicles bills, appliances, oriental rugs, and travel expenses. The record does not establish that HSR had an office or a payroll, nor does the record establish that HSR maintained regular records of business activity. With regard to HSR, corporate Federal income tax returns for HSR's taxable years ending September 30, 1986, 1987, 1988, and *292 1989, were not timely filed. As a result of respondent's audit, Robert prepared, or had prepared, HSR's corporate Federal income tax returns for all of the above years, and these returns were untimely filed on July 16, 1990. On HSR's untimely filed corporate Federal income tax returns for its taxable years ending September 30, 1986, 1987, and 1988, rental income relating to the HSR Property was reported of $ 35,882, $ 34,866, and $ 52,650, respectively. On HSR's untimely filed corporate Federal income tax return for its taxable year ending September 30, 1989, HSR's adjusted tax basis in the HSR Property that was sold in 1988 for $ 1,550,000 was reported to be $ 2,433,532, and after expenses associated with the sale, a $ 882,532 loss with respect to this sale was reported on HSR's return. On their 1986, 1987, and 1988 joint Federal income tax returns, petitioners did not report any rental income associated with the HSR Property, any income from the 1988 sale of the HSR Property, nor any other distributions from HSR. On audit for 1988, respondent determined that petitioners received and were taxable on a $ 1,092,786 constructive dividend from HSR relating to the sale and refinancing *293 of the HSR Property. This amount was determined by respondent as a result of the approximate $ 145,000 in net proceeds received by petitioners on refinancing the HSR Property with Bank of America, the $ 450,000 gross loan proceeds received by petitioners in connection with the personal loan from CCB with respect to which the HSR Property was used as collateral, and the $ 497,786 check received in connection with sale of the HSR Property that was deposited into HSR's bank account at Lloyds Bank of London. Alternatively, respondent argues that HSR was a sham corporation and, therefore, that $ 1,092,786 of the capital gain that respondent determined was realized on sale of the HSR Property should be taxed directly to petitioners. The Wenz Family Trust
On March 7, 1977, petitioners, as grantors, established The Wenz Family Trust, and petitioners contributed to the trust $ 500 in cash and a 75-percent future profits interest in a 20-percent interest in real property located in Webster County, Kentucky. From 1977 through 1988, Judith was trustee, and petitioners' two minor children were beneficiaries of The Wenz Family Trust. Under the terms of The Wenz Family Trust, the trust *294 was irrevocable and could not be amended or modified. Current income of The Wenz Family Trust, if any, was required to be distributed at least every 3 months for support of petitioners' two children. Portions of the trust corpus were to be distributed to the children as each child reached specified ages. Technically, other than to provide income for support of petitioners' two children, Judith's administrative powers as trustee of The Wenz Family Trust did not include the power to use trust assets to benefit petitioners. Judith, as trustee, was to keep separate trust accounts for each child's interest in the trust. During 1986, 1987, and 1988, The Wenz Family Trust owned 100 percent of the outstanding shares of stock of Western Investment Corp.-Cayman Islands (WICI), a Cayman Islands corporation formed by petitioners apparently just to maintain a stock brokerage account on behalf of The Wenz Family Trust. From January 24, 1985, when the above stock brokerage account was opened, through 1988, WICI maintained the stock brokerage account at Bear, Stearns & Co. in New York City (the WICI brokerage account). Trading and investments on behalf of the WICI brokerage account earned *295 passive interest income, dividend income, and capital gain income as follows: Interest
Dividend
Capital Year
Income
Income
Gain Income 1986
$ 3,748
$ 27,685
$ 36,453
1987
3,527
18,689
14,532
1988
2,937
30,875
12,968
Total
$ 10,212
$ 77,249
$ 63,953
During 1986, 1987, and 1988, the above interest, dividend, and capital gain income apparently represented the only income of WICI and also apparently (through its ownership of WICI) the only income of The Wenz Family Trust. None of the above income was reported on any U.S. Federal income tax returns filed by WICI, by The Wenz Family Trust, by petitioners, or by petitioners' children, beneficiaries of The Wenz Family Trust. Monthly statements issued by the New York City brokerage house relating to the WICI brokerage account generally reflected that WICI was owner of this account. The statements were addressed to WICI, c/o International Mgmt. Svces, Attn: Michael Howard, and to an address located in Grand Cayman Island, British West Indies. Robert, however, on the statement for the period ending February 27, 1987, had his name substituted for the name of WICI as owner of the WICI brokerage account. Additionally, *296 in the space on this statement for the owner's address, Robert's home address in London, England, was reflected. This February 27, 1987, statement, reflecting Robert as owner, was submitted to CCB in connection with Robert's request for a $ 500,000 personal line of credit that is described in more detail below. On the above statement, the market value of the WICI brokerage account was indicated to be $ 470,158. Apparently, WICI engaged in no business activities other than maintenance of the WICI brokerage account. During November of 1987, Robert applied to CCB for a $ 500,000 personal line of credit for the stated purpose of financing personal expenses and personal investments. Robert, in support of the application with CCB for a personal line of credit, submitted to CCB an altered copy of petitioners' 1986 joint Federal income tax return that materially differed from petitioners' 1986 joint Federal income tax return that petitioners had filed with respondent. The chart below reflects some of the significant differences between petitioners' 1986 joint Federal income tax return, as filed with respondent, and the altered copy of petitioners' 1986 joint Federal income tax return, *297 as altered and as submitted by petitioners to CCB: As Filed with
Respondent As Altered for CCB
Interest
$ 249 $ 8,302
Dividend Income
- 0 -
17,724
Consulting Income
- 0 -
229,561
Capital Gain
- 0 -
23,674
Portions of the above additional interest and dividend income that were reflected on the altered copy of petitioners' 1986 joint Federal income tax return that Robert submitted to CCB apparently related to interest and dividend income nominally earned by the WICI brokerage account. With his application for a personal line of credit, Robert also submitted to CCB a personal financial statement dated April 1, 1987. On this financial statement, it was represented that Robert's personal assets included: (1) Waisler's $ 100,000 promissory note received in partial consideration for the sale to Waisler of the property nominally held by OMR (namely, the OMR Property); (2) the brokerage account nominally owned by WICI (namely, the WICI brokerage account); (3) the residence and property nominally held by HSR (namely, the HSR Property) with a stated fair market value of $ 1,800,000; and (4) a parcel of real property located in Hawaii owned by Judith with a stated *298 fair market value of $ 300,000. On December 30, 1987, CCB approved the $ 500,000 personal line of credit for Robert, and on February 26, 1988, Robert executed in favor of CCB a promissory note for $ 500,000 with stated annual interest of 10 percent. Robert used the HSR Property, nominal legal title to which was held by HSR, as collateral to secure this $ 500,000 personal line of credit. In 1988, after debiting Robert's $ 500,000 personal line of credit, CCB made two wire transfers each in the amount of $ 225,000 to petitioners' personal bank account at Lloyds Bank of London. Sometime after 1984, Robert, nominally on behalf of The Wenz Family Trust, applied to CCB for two additional loans of approximately $ 40,000 each. These loans were approved by CCB, and The Wenz Family Trust received from CCB total loan proceeds of approximately $ 80,000. Sometime prior to June of 1987, Robert personally guaranteed a $ 39,488 loan from CCB to The Wenz Family Trust. In a letter to Bank of America dated June 16, 1987, in connection with Robert's application to Bank of America for a $ 500,000 loan, Robert stated that, because financial information was not available regarding The Wenz Family *299 Trust, Robert had personally guaranteed the $ 39,488 loan from CCB to The Wenz Family Trust. There is no evidence in the record that The Wenz Family Trust ever maintained a bank account. There is no evidence in the record to indicate that income of The Wenz Family Trust was ever distributed to petitioners' children. Judith did not maintain separate trust accounts for each child's interest in the trust assets, as required by The Wenz Family Trust agreement, and the record in this case does not contain any records or documents with regard to Judith's administration of trust income and assets. On audit, for 1986, 1987, and 1988, respondent determined that The Wenz Family Trust was a grantor trust and a sham, lacking in economic substance, and therefore that petitioners should be charged with the interest income, dividend income, and capital gain income earned by the WICI brokerage account for each of the years 1986, 1987, and 1988, as set forth above and as repeated below: Interest
Dividend
Capital Year
Income
Income
Gain Income 1986
$ 3,748
$ 27,685
$ 36,453
1987
3,527
18,689
14,532
1988
2,937
30,875
12,968
Total
$ 10,212
$ 77,249
$ 63,953
Sale *300 of Hawaii Property
On April 10, 1987, Judith purchased a fee interest in residential real property located at 420 Dune Circle, Kailua, Hawaii (the Hawaii Property), for a total purchase price of $ 111,780. As the chart supra p. 5 indicates, funds in the checking account of E.E.I. were used to pay many of petitioners' personal expenses (namely, among others, personal credit card bills, passport renewal fees, personal medical bills, and magazine subscription fees). Also, in 1987, Robert transferred into E.E.I.'s checking account $ 155,000 by depositing into E.E.I.'s account checks that he had drawn on Bishops Bank's account at Bank of America. Robert then wrote three checks on E.E.I.'s checking account in favor of Judith in the cumulative total amount of $ 155,312.40. The purpose of these checks was to transfer funds to Judith for Judith's purchase of the Hawaii Property. On December 30, 1987, Judith sold the Hawaii Property to an unrelated third party for $ 400,000 in cash. This $ 400,000 received on sale of the Hawaii Property was placed in escrow, and E.E.I. was named as payee with regard to distributions to be made from the escrow account. On December 31, 1987, the *301 escrow agent transferred out of the escrow account total net proceeds of $ 372,600 relating to sale of the Hawaii Property to E.E.I.'s savings account at Barclays Bank of California. On January 4, 1988, however, petitioners withdrew from E.E.I.'s savings account at Barclays Bank of California $ 330,020 for their personal use. In spite of the fact that the escrow account relating to sale of the Hawaii Property was in the name of E.E.I., petitioners acknowledge that Judith was the owner and seller of the Hawaii Property. The only issue relating to this sale is the amount of capital gain Judith realized on the sale. For 1987, respondent determined that Judith realized a $ 251,548 capital gain relating to sale of the Hawaii Property. Petitioners contend that there should be added to Judith's tax basis in the Hawaii Property additional alleged costs of $ 140,699 relating to Judith's purported purchase in 1977 of a 55-year leasehold interest in the underlying real property, and other miscellaneous expenses, and that Judith realized a net capital gain on sale of the Hawaii Property of only $ 16,390. Petitioners' Federal Income Tax Returns
On their timely filed 1986, 1987, and *302 1988 joint Federal income tax returns, the only income petitioners reported was interest income of $ 249, $ 274, and $ 447, respectively. No other income was reported by petitioners on these returns, and, other than the standard deduction and personal exemptions, no deductions, credits, carryover deductions, or carryover credits were claimed. In connection with respondent's audit of petitioners' joint Federal income tax returns for 1986, 1987, and 1988, respondent's agent requested that petitioners file a statement indicating their total personal living expenses for 1986. In response to this request, petitioners submitted a Form 4822, Statement of Annual Estimated Personal and Family Expenses, on which petitioners reported annual 1986 personal expenses of only $ 23,400. On the Form 4822 that petitioners submitted to respondent, no personal expenses were reflected for rent, mortgage payments, utilities, taxes, or insurance. During respondent's audit, respondent's agent issued third-party summonses to various banks requesting bank account statements, copies of canceled checks, and loan documents relating to petitioners, individually, and to entities in which petitioners had an *303 ownership interest. Petitioners objected to any compliance by the third parties to these summonses. Also for 1986, in addition to adjustments already mentioned, respondent determined that petitioners received additional interest income from various banks totaling $ 5,060. This interest income related to a portion of the interest income reported by petitioners on the altered Form 1040 for 1986 that petitioners submitted to CCB in connection with Robert's application with CCB for a $ 500,000 personal line of credit. For 1986, 1987, and 1988, respondent also determined the fraud and the substantial understatement additions to tax. As an alternative to the additions to tax for fraud, respondent asserted in the answer additions to tax for negligence. OPINION Income Adjustments Relating to Sale of OMR, HSR, and Hawaii Properties, and Interest
Generally, income from property and investments must be taxed to the taxpayer who owns the property and the investments generating the income. Helvering v. Horst, 311 U.S. 112, 119 (1940). For Federal income tax purposes, a corporation will be recognized as a separate taxable entity if either: (1) The formation *304 of the corporation was based on a legitimate business purpose; or (2) after formation, the corporation actually conducted a legitimate business. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943). Where, however, a corporation constitutes a mere shell and was not either formed or conducted for any nontax business purpose, its existence will be disregarded for Federal income tax purposes even though validly incorporated under State law. Noonan v. Commissioner, 52 T.C. 907, 910 (1969), affd. 451 F.2d 992 (9th Cir. 1971); see also Moline Properties, Inc. v. Commissioner, supra.
Income from property and from transactions nominally earned by a sham corporation will be taxed to the shareholders of the corporation, rather than to the sham corporation in whose behalf the property and the transactions were nominally titled or conducted. Jackson v. Commissioner, 233 F.2d 289, 291 (2d Cir. 1956), affg. 24 T.C. 1 (1955); Paymer v. Commissioner, 150 F.2d 334, 337 (2d Cir. 1945), *305 affg. in part, revg. and remanding in part memorandum opinions of this Court. Respondent argues that $ 150,000 with respect to OMR for 1986 and $ 1,092,786 with respect to HSR for 1988, relating to sale of the OMR and HSR Properties, constituted constructive dividends taxable directly to petitioners. Alternatively, respondent argues that OMR and HSR were sham corporations used to pay petitioners' personal expenses and that $ 150,000 with respect to OMR for 1986 and $ 1,092,786 with respect to HSR for 1988, relating to sale of the OMR and HSR Properties, constituted capital gain income taxable directly to petitioners. Petitioners argue that they did not receive constructive dividends from OMR and from HSR, and that income realized upon sale of the OMR and HSR Properties was used, during 1986, 1987, and 1988, by OMR and by HSR to make various loans, not to pay petitioners' personal expenses. Petitioners also argue that OMR and HSR were not sham corporations and that they should be respected for tax purposes. Petitioners note that OMR and HSR were validly incorporated under Illinois law, that OMR and HSR filed annual reports with the State of Illinois, that OMR and HSR maintained *306 bank accounts, and that HSR carried on a business activity by occasionally renting the large residence and the cottage located on the HSR Property. Petitioners have not established any valid business purpose for the existence of OMR and HSR. On the record before us, the only activities engaged in by OMR and by HSR were activities associated with nominal, legal ownership of the OMR and HSR Properties. The only motive we discern for transfer of these parcels of real property to OMR and HSR was one of tax avoidance. With regard to funds received by OMR and HSR on sale of the OMR and HSR Properties, petitioners engaged in circular transfers of funds among the various entities they controlled. We find significant the fact that Robert signed all of the checks that transferred funds from entity to entity and that purportedly related to undocumented alleged loan transactions. We believe that certain notations of Robert on many of the checks indicating that the checks represented loans or repayments of loans are not credible and are not corroborated by any evidence in the record. Petitioners did not offer any loan documents, testimony, or other evidence that loans existed among the *307 corporations and entities petitioners controlled. In light of the fact that OMR, HSR, and E.E.I. were wholly owned by petitioners and that petitioners also owned, controlled, or used Kingston Finance, Western Investment-Hawaii, Bishops Bank, Binney Properties, and The Wenz Family Trust for their personal purposes, petitioners had access to any such loan documents, and, if such documents in fact existed, petitioners should have produced them at trial. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Funds in the bank accounts of OMR, HSR, E.E.I., and Western Investment-Hawaii were used by petitioners to pay personal expenses incurred by petitioners. Petitioners did not produce any books or records with regard to any business activities engaged in by petitioners or by OMR, HSR, E.E.I., or Western Investment-Hawaii that would refute the personal nature of these expenses. Petitioners in effect used OMR, HSR, E.E.I., and Western Investment-Hawaii as their corporate pocketbooks for the payment of personal expenses. OMR and HSR maintained no offices, no payroll, and no *308 corporate records of business activities or transactions. Petitioners, as sole officers and directors of OMR and HSR, were responsible for filing OMR's and HSR's tax returns. Petitioners, however, did not file tax returns for OMR and HSR until after respondent's audit of petitioners' tax returns had begun. No tax returns were filed on behalf of E.E.I. or Western Investment-Hawaii. In 1987, petitioners individually refinanced with Bank of America the outstanding mortgage loans on the HSR Property by causing HSR to temporarily transfer to themselves legal title to the HSR Property. On the financial statement Robert submitted to CCB, Robert listed as his personal assets the HSR Property and the $ 100,000 note receivable from Waisler (received in connection with sale of the OMR Property). We agree with respondent that OMR and HSR should be treated as sham corporations and disregarded for Federal income tax purposes. The evidence indicates that petitioners formed OMR and HSR to hold nominal, legal title to the OMR and HSR Properties in an attempt to enable petitioners to avoid paying Federal income taxes on gains to be realized upon sale of the two properties and in an effort to *309 enable petitioners to avoid reporting rental income from the HSR Property. We sustain respondent's determination that OMR and HSR should be treated as sham corporations and that $ 150,000 of the capital gain relating to sale in 1986 of the OMR Property and $ 1,092,786 of the capital gain relating to sale in 1988 of the HSR Property are to be taxed to petitioners. Respondent also argues that Judith received additional capital gain income in the amount of $ 251,548 resulting from sale of the Hawaii Property. As indicated, petitioners concede that Judith owned the Hawaii Property and that any gain on sale of the Hawaii Property should be taxed to petitioners in 1987. Petitioners, however, argue that respondent should have added $ 140,699 to Judith's cost basis in the Hawaii Property relating to a 55-year leasehold interest in the property that Judith allegedly purchased in 1977. Petitioners have not offered any credible evidence as to Judith's cost of purchasing a leasehold interest in the Hawaii Property. Although petitioners apparently owned some interest in the Hawaii Property before 1987, when Judith purchased for $ 111,780 and then sold for $ 400,000 the fee interest, we cannot *310 adequately verify and determine from the record the amount Judith paid for the alleged leasehold interest. We note that petitioners did not testify regarding this or any other issue in this case. We sustain respondent's determination that Judith realized a capital gain of $ 251,548 on sale of the Hawaii Property. Petitioners also argue that the computation of tax basis in the OMR, HSR, and Hawaii Properties should be increased for capital expenditures made on each of these parcels of real property. Petitioners have dumped on the Court numerous receipts relating to expenditures allegedly incurred with regard to these three parcels of real property. Petitioners, however, did not present any credible evidence or testimony at trial, nor did petitioners themselves testify as to the nature of these expenditures, nor as to the effect these alleged expenditures would have on the computation of petitioners' appropriate tax basis in these parcels. Moreover, many of the alleged expenditures appear to represent noncapital expenses for yard maintenance, home furnishings, garbage collection, carpet cleaning, firewood, and household repairs. In the absence of further credible documentation, *311 schedules, or testimony, there is no basis on which the Court could appropriately estimate which of the alleged expenditures should now be capitalized and added to petitioners' tax basis in the above parcels of real property for purposes of determining the amount of capital gain realized upon sale of the parcels. See Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). We now consider the $ 5,060 in additional interest income determined by respondent for 1986. This $ 5,060 in interest income was reflected on the altered Form 1040 for 1986 that Robert submitted to CCB, but this interest income was not reported on petitioners' 1986 joint Federal income tax return filed with respondent. Petitioners have not offered any evidence to establish that this interest income was not received by petitioners in 1986, as reflected on the altered tax return. We sustain respondent's determination that this additional $ 5,060 in interest income should be charged to petitioners. Adjustments Relating to The Wenz Family Trust
In general, the grantor trust provisions of sections 671 through 677 govern whether a grantor is taxed on trust income and whether the *312 trust will be recognized for tax purposes. Section 674(a) requires a grantor to be treated as owner of a trust if the grantor has certain administrative powers over the beneficial enjoyment of either trust corpus or trust income without approval or consent of an adverse party. Apart, however, from the grantor trust rules, if a trust has no economic substance other than tax avoidance, the trust will be treated as a sham and will not be recognized for Federal income tax purposes. Neely v. United States, 775 F.2d 1092, 1094 (9th Cir. 1985); Zmuda v. Commissioner, 731 F.2d 1417, 1421 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Markosian v. Commissioner, 73 T.C. 1235, 1245 (1980). This rule applies regardless of whether the trust is recognized under State law. Zmuda v. Commissioner, 79 T.C. at 720. Technical compliance with the grantor trust rules cannot serve to breathe economic substance into a trust where none exists. See Furman v. Commissioner, 45 T.C. 360, 366 (1966), affd. per curiam 381 F.2d 22 (5th Cir. 1967). *313 Under appropriate circumstances, the manner in which a trustee administers a trust may be evidence of the lack of economic substance and of the sham nature of the trust. Bennett v. Commissioner, 79 T.C. 470, 487-488 (1982). In Markosian v. Commissioner, supra at 1245, we stated the following with regard to the grantor trust provisions and the economic substance of a trust arrangement: This is not to say, as a general rule, that income from a trust legally created and administered may be lightly attributed to the settlor outside of the statutory provisions provided by Congress in sections 671 through 677. However, when the settlor is trustee and the beneficiaries are the settlor and his family, such trust arrangements must be closely scrutinized for economic substance. Helvering v. Clifford, 309 U.S. 331 (1940). We can find no substance in this arrangement. Since * * * [the taxpayers] did not respect this trust as a separate entity, we can see no reason to do so, and we therefore sustain respondent's determination. [Fn. ref. omitted.] Court decisions make it clear that "A trust *314 arrangement may not be used to turn a family's personal activities into trust activities, with the family expenses becoming expenses of trust administration." Neely v. United States, supra at 1094 (citing Schulz v. Commissioner, 686 F.2d 490, 493 (7th Cir. 1982), affg. T.C. Memo. 1980-568). In such situations, and apart from the grantor trust rules, courts look through the form of the trust arrangement and determine the tax consequences based upon the substance of the transactions. Markosian v. Commissioner, supra at 1241; Furman v. Commissioner, supra at 366. Respondent argues that for 1986, 1987, and 1988, interest income, dividend income, and capital gain income totaling $ 10,212, $ 77,249, and $ 63,953, respectively, relating to the WICI brokerage account should be taxed to petitioners under the grantor trust provisions of the Code. Respondent argues that because Judith, one of the grantors of The Wenz Family Trust, was also trustee of the trust, and as trustee she could exercise certain administrative powers without *315 consent of an adverse party, all income from The Wenz Family Trust should be taxed directly to petitioners. Respondent also argues that apart from the grantor trust rules, The Wenz Family Trust lacked economic substance, that the trust should be regarded as a sham, and that WICI should be regarded either as a nominee or a sham corporation, and, therefore, that income earned on the WICI brokerage account should be taxed directly to petitioners. Petitioners argue that the interest, dividend, and capital gain income relating to the WICI brokerage account should be taxed to The Wenz Family Trust, but not to petitioners. Petitioners argue that The Wenz Family Trust agreement satisfied all of the requirements of the grantor trust provisions. Petitioners also argue that petitioners did not use any trust assets for their personal benefit. Petitioners argue, therefore, that The Wenz Family Trust had economic substance and should not be regarded as a sham entity. We agree with respondent's argument that The Wenz Family Trust lacked economic substance and should be treated as a sham. The Wenz Family Trust agreement appears to comply with the literal, technical requirements of the grantor *316 trust rules. Petitioners, however, as grantors of The Wenz Family Trust, did not comply with the stated terms of The Wenz Family Trust agreement, and petitioners exercised beneficial enjoyment and control over trust assets. Although Robert was not a trustee of The Wenz Family Trust and was not authorized to act on behalf of the trust, Robert was involved in administration of The Wenz Family Trust. Robert negotiated on behalf of The Wenz Family Trust for loans, and he personally guaranteed at least one loan made to The Wenz Family Trust. We find significant the fact that Robert listed the WICI brokerage account as a personal asset in order to obtain a personal line of credit with CCB. Robert's name was also shown on WICI's monthly statement of February 27, 1987, as owner of the WICI brokerage account. Judith, as trustee of The Wenz Family Trust, never filed Federal income tax returns on behalf of the trust. Also, there is no evidence in the record that Judith ever made the required distributions of trust income to or for the benefit of petitioners' children. There is no evidence in the record that The Wenz Family Trust maintained a bank account for trust income and assets, *317 or that Judith, as trustee, maintained records with regard to administration of trust assets. We conclude that petitioners treated assets of The Wenz Family Trust as their own. We also conclude that The Wenz Family Trust constituted an economic sham created by petitioners to disguise the personal nature of income nominally earned by the trust and to avoid the payment of Federal income taxes. Since petitioners did not respect The Wenz Family Trust as a separate entity, we see no reason to do so. See Markosian v. Commissioner, supra at 1245. The Wenz Family Trust is to be disregarded for Federal income tax purposes, and petitioners are to be treated as owning 100 percent of the outstanding stock of WICI. WICI, with regard to the WICI brokerage account, is to be regarded as a mere nominee, and petitioners (because of the sham nature of The Wenz Family Trust) are to be regarded as the true owners of that account. We note that Robert listed this account as one of his personal assets in his application to CCB for a personal loan. We also note that by arguing in their briefs that The Wenz Family Trust should be treated as earning the income realized *318 by the WICI brokerage account, petitioners essentially have conceded that WICI was only a nominee with regard to this account. The income realized by the WICI brokerage account in 1986 through 1988 is to be taxed directly to petitioners. Petitioners argue that for 1986, 1987, and 1988 they are now entitled to further miscellaneous deductions not allowed by respondent for items such as interest expense, property taxes, legal fees, charitable contributions, and miscellaneous itemized deductions. Petitioners have the burden to prove their entitlement to these deductions, and they have failed to do so. Rule 142(a). These alleged deductions were not claimed by petitioners on their 1986, 1987, or 1988 Federal income tax returns. We conclude that petitioners have not satisfied their burden of proving that respondent's deficiency determinations are erroneous. We sustain in full respondent's deficiency determinations as to petitioners' Federal income tax liabilities for 1986, 1987, and 1988. Additions to Tax
For 1986, 1987, and 1988, respondent determined that petitioners are liable for the fraud addition to tax. With regard to the fraud addition to tax, section 6653(b)(1) *319 provides for an addition to tax of 75 percent of the portion of the underpayment that is attributable to fraud. Additionally, for 1986 and 1987, section 6653(b)(1) provides for an increase of 50 percent of the interest due under section 6601 on the portion of the underpayment attributable to fraud. Respondent has the burden of proof on the fraud addition to tax. Sec. 7454(a); Rule 142(b). To satisfy this burden of proof, respondent must prove by clear and convincing evidence each of the following elements of tax fraud under section 6653: (1) That the taxpayer underpaid taxes owed for each year; and (2) that some part of the underpayment for each year is due to fraud. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 515 (1992). Fraud consists of an intentional wrongdoing for the purpose of avoiding the payment of taxes known to be owed. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). *320 The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Parks v. Commissioner, 94 T.C. 654, 660 (1990); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Beaver v. Commissioner, 55 T.C. 85, 92 (1970). A pattern of consistent underreporting of income indicates fraud, as does the failure to maintain adequate records of income and expenses. Holland v. United States, 348 U.S. 121, 137 (1954); Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63; Lollis v. Commissioner, 595 F.2d 1189, 1192 (9th Cir. 1979), affg. T.C. Memo. 1976-15; Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); Otsuki v. Commissioner, 53 T.C. 96, 109 (1969). The use of a corporation to disguise the personal nature of income and expenses may be *321 evidence of fraud. Truesdell v. Commissioner, 89 T.C. 1280, 1302-1303 (1987); Benes v. Commissioner, 42 T.C. 358, 383 (1964), affd. 355 F.2d 929 (6th Cir. 1966). Further, a taxpayer's failure to cooperate during respondent's investigation of a taxpayer's returns may be evidence of fraud. Truesdell v. Commissioner, supra at 1303. In support of the contention that petitioners filed fraudulent tax returns for 1986, 1987, and 1988, respondent argues that petitioners filed with respondent false 1986, 1987, and 1988 joint Federal income tax returns on which they significantly underreported their correct taxable income, that petitioners used corporations they controlled and The Wenz Family Trust to disguise the personal nature of income and expense items, that petitioners failed to maintain books and records for their controlled corporations, for The Wenz Family Trust, and for themselves, and that petitioners followed a pattern of consistent underreporting of income. Respondent also argues that petitioners did not cooperate in respondent's audit of petitioners' *322 tax returns. Petitioners argue that they reasonably believed they did not owe Federal income taxes for the years in dispute because they thought they were entitled for each year to net operating loss, charitable contribution, long-term capital gain, investment tax credit carryover, and other deductions. Petitioners did not report or disclose these alleged carryovers and deductions on their Federal income tax returns for the years in dispute, and petitioners offered no credible evidence or testimony to establish the character or availability of these alleged carryovers and deductions. During November of 1987, Robert submitted to CCB an altered copy of petitioners' 1986 Federal income tax return that differed materially from the 1986 tax return filed with respondent. We have concluded that OMR and HSR constituted sham corporations created by petitioners to avoid paying Federal income taxes. Petitioners should have reported on their 1986 and 1988 tax returns the capital gain income realized on the sale of the OMR and HSR Properties. During 1986, 1987, and 1988, petitioners used the checking accounts of OMR, HSR, E.E.I., and Western Investment-Hawaii to pay personal expenses. The *323 receipt of the funds to pay these personal expenses was not reported as income on petitioners' tax returns. Petitioners used these corporations in an attempt to shelter personal income from Federal income tax and to disguise personal expenses. On their 1986 return, petitioners failed to report interest income from various banks, which income Robert reported on the altered 1986 tax return submitted to CCB. Moreover, petitioners agree that they failed to report in 1987 capital gain resulting from sale of the Hawaii Property. Petitioners have a good education, and they have substantial experience in business activities. In light of the evidence in this case, it is evident that petitioners were aware that they realized taxable income substantially in excess of that reported on their 1986, 1987, and 1988 Federal income tax returns. We further note that petitioners did not cooperate in the audit of their tax returns. In holding for respondent on the fraud addition to tax, we emphasize petitioners' underreporting of their income on their 1986, 1987, and 1988 tax returns, petitioners' pattern of underreporting in each year, petitioners' failure to maintain adequate records, petitioners' *324 attempt to disguise the personal nature of many income and expense items, and petitioners' preparation and submission to CCB of an altered 1986 Federal income tax return, on which there was reported significantly higher income than they reported on the 1986 tax return actually filed with respondent. Respondent has established by clear and convincing evidence that all of the underpayments involved herein were attributable to fraud. We conclude, therefore, that petitioners for 1986, 1987, and 1988 are liable for the section 6653(b)(1) fraud addition to tax and for the increased interest determined by respondent. For 1986, 1987, and 1988, respondent also determined that petitioners are liable under section 6661 for an addition to tax equal to 25 percent of the respective underpayments of tax. To be liable for the substantial understatement addition to tax under section 6661, the amount of the understatement must exceed the greater of 10 percent of the tax required to be shown on the Federal income tax return or $ 5,000. Sec. 6661(b)(1)(A). For purposes of section 6661, the amount of the understatement is reduced to the extent that the understatement is attributable to items with *325 respect to which the taxpayer's tax treatment of the items is or was supported by substantial authority. Sec. 6661(b)(2)(B). We have concluded that petitioners fraudulently failed to report substantial amounts of income on their 1986, 1987, and 1988 Federal income tax returns. Petitioners did not have substantial authority for their failure to report as income the adjustments made by respondent that we have sustained. We sustain respondent's determination that petitioners for 1986, 1987, and 1988 are liable for the section 6661 addition to tax. Decision will be entered under Rule 155.